UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Rosely de Jesus | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:09-cv-00285 |
| | § | |
| Ziad Husseini, M.D. | § | |
|     Defendant. | § | |

## COMPLAINT

Plaintiff Rosely de Jesus files this Complaint against Defendant Ziad Husseini, M.D., and alleges as follows:

### I. INTRODUCTION

1. Human trafficking is a modern-day form of slavery, involving victims who are forced, defrauded, or coerced into sexual or labor exploitation. Trafficking in human beings is reaching epidemic proportions throughout the world, including right here in the United States. Former President George W. Bush called human trafficking a special kind of evil in the abuse and exploitation of the most innocent and vulnerable. And Congress, recognizing the countless human tragedies such practices inflict, passed the Trafficking Victims Protection Reauthorization Act of 2003 (TVPRA), establishing a private cause of action for victims of human trafficking in order to make those victims whole and to deter the perpetrators from committing such acts. This action is brought under the TVPRA and other state and federal laws to seek just compensation for Plaintiff—a victim of human trafficking—and bring the perpetrator to account.

### II. JURISDICTION AND VENUE

2. This Court has original jurisdiction based on the TVPRA, 18 U.S.C. § 1595, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b).

3. This Court has supplemental jurisdiction over the related state law claims under the doctrine of pendent jurisdiction and pursuant to 28 U.S.C. § 1367. Supplemental jurisdiction over these claims is appropriate because they arise from the same common nucleus of operative facts from which the federal claims arise.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant resides in the Northern District of Texas, Dallas Division, and because all or substantially all of the events giving rise to the claims in the Complaint occurred in the Northern District of Texas.

### III. PARTIES

5. Plaintiff is a citizen of the Philippines who resided in Defendant's Richardson, Texas home for approximately fifteen months. From the time of her December 2008 escape from Defendant through the present, she has resided at an undisclosed location in Dallas, Texas.

6. Defendant is a citizen of Lebanon who resides at 4716 Millwood Drive, Richardson, Texas 75082, where he has lived since September 2007. He employed Plaintiff as a domestic worker—first at his home in Lebanon, and then at his home in Richardson—from February 2005 until her escape. At all relevant times Defendant was an employer pursuant to the FLSA.

### IV. FACTS

7. In 2004, Plaintiff was living in the Philippines. Having survived both of her parents and been abandoned by her husband, she was trying to support her two children without financial means. Because of the economic conditions there, it is common for poor women to seek work as housekeepers (and/or "nannies") in foreign countries with the assistance of an employment agency. Their experiences are often quite positive, and Plaintiff in fact had worked previously for a family in Malaysia that treated her with great care and respect. Looking forward to another positive experience, Plaintiff sought work again through the same employment

agency. Her plan was to place her children in the care of her brother while she worked abroad to raise support.

8.  Plaintiff's employment agency introduced her to and facilitated an agreement with Defendant, who lived in Lebanon. Plaintiff was to work in Defendant's household for two years, and in return, she was to receive a salary of $200 per month, Sundays off to attend church and to rest, the ability to freely communicate with friends and family, and opportunities to return and visit her family in the Philippines.

**Confinement, psychological control, and other abuse**

9.  Upon arrival at Defendant's Lebanon home in February 2005, however, Plaintiff quickly learned that this job would be nothing like her experience with the family in Malaysia. Defendant immediately took her passport and told her that she could not leave the house. He kept the doors to his home locked to prevent her escape, and a security guard and/or other family members remained there to inform him in case she tried to do so in his absence. He forbade her from talking to anyone outside the home, and she could not use the telephone without permission. Even with permission, she could only talk to her children in the Philippines on occassion. Defendant further informed her that she would have no days or time off, and that she had to work continually for him for three years instead of the two she agreed to. Also, her salary would be $160 per month instead of the $200 per month Defendant originally promised.

10. Defendant used a variety of methods to instill fear in Plaintiff and to intimidate her into complete subservience. In one instance, after Plaintiff tried to use the telephone to make a local call, Defendant assaulted her—bruising her and causing her to vomit—and locked her in her room for two straight days. Defendant also constantly yelled at, demeaned, and otherwise

terrorized her. Plaintiff lived in a constant state of fear and anxiety, afraid even that Defendant might take her life.

11. Another of Defendant's tools to maintain Plaintiff's dependence on him and prevent her escape was to keep control over her money. He refused to let her even see the wages she earned, and only allowed her to send a portion of it to her family in the Philippines. Much of this money is still in Defendant's possession.

12. Plaintiff's daily work included taking care of and cleaning up after Defendant's two children, preparing meals for the entire family, performing all housework, and other household duties. She worked constantly from the time she woke up at 6 a.m. until 10:30 p.m., when she was allowed to go to bed. She had no days off, and was never permitted to return to the Philippines to visit her family, attend church, or observe her religious holidays. Even her own birthday was a day of forced work like every other.

**Scheme to get Plaintiff to United States**

13. Beginning in mid-2006, Defendant's demeanor towards Plaintiff changed dramatically. He stopped shouting and intimidating her and began to treat her with what appeared to be kindness and respect. He went as far as to tell her that she was like a daughter to him, and asked her to call him "dad."

14. Having been conditioned for 15 months to expect inhumane treatment and to believe that such degradation was normal, this change in Defendant had a profound impact on Plaintiff's view of him. Sadly, like so many other women who have been conditioned by abusive circumstances, she could not see that Defendant's change in demeanor was just a temporary facade designed to lull her into a false sense of safety. This period only served to increase her dependence on him and reinforce Defendant's tightening grip on her life.

15.     The reason for Defendant's change in tone was that he was making plans to move to the United States and wanted Plaintiff to go with him—voluntarily. He needed her willing cooperation in order to convince immigration and customs officials to allow them into the country. Thus, when he eventually asked her to go, he offered to triple her salary, give her a private bedroom in a comfortable house, and finally allow her to take Sundays off from work. Having become psychologically dependent on Defendant and now trusting him, Plaintiff accepted the offer. Together, the two of them went through the immigration process and obtained American work visas.

**<u>Abuse continues after arrival in United States</u>**

16.     Almost immediately upon Plaintiff's and Defendant's arrival in the United States in September 2007, Plaintiff realized that she had been tricked. But it was too late. Defendant again locked away her passport and travel documents, forbade her from leaving the house, and (other than telephone calls to her children in the Phillipines) did not allow her to make contact with the outside world. He humiliated and degraded her by forcing her to sleep on a couch in a common living area and to live out of a suitcase, even though the private bedroom he promised her sat vacant and available. Again, instead of giving her Sundays off as promised, he forced her to work continuously without relief from her duties. He shouted at, demeaned, and intimidated Plaintiff just as he did during Plaintiff's first year and a half of employment in Lebanon. Plaintiff deeply regretted coming to the United States with Defendant and felt trapped, but was unable to leave.

17.     As before, Plaintiff's workday began at 6:00 a.m. when she awoke and ended at 10:30 p.m. when she was allowed to go to bed, though even then she was not completely relieved of her duties. Defendant's children were always free to talk in and occupy the living room where

Plaintiff tried to sleep, and she was expected to be "on call" to attend to any demands that arose. She had no days off and no periods of complete freedom from work.

18. As in Lebanon, Defendant kept control over Plaintiff's money with the conscious aim of preventing her from leaving. Defendant supposedly paid Plaintiff $480 per month for her services, but she was never allowed to access this money and never possessed cash. Defendant placed the little money Plaintiff earned in a joint bank account he opened in both of their names, and only allowed the funds to be sent home to her family in the Philippines. Though legally Plaintiff could access this account, through Plaintiff's effective imprisonment Defendant ensured that she could never actually do so.

19. Aware that Plaintiff's wages were well below the federal minimum, Defendant forced Plaintiff to sign a sham timesheet each month indicating that she only worked 20 hours per week. Plaintiff did not understand the minimum wage laws and did not know the purpose for the timesheets, but still protested because they were not true. She relented and reluctantly signed the false timesheets only after Defendant intimidated her into doing so.

20. Additionally, Defendant systematically instilled fear in Plaintiff of any person that might come to the house. He trained her to believe that no one could be trusted and that people would try to harm her, to the point that Plaintiff would not open the door for strangers unless Defendant told her in advance to expect them and that they therefore could be trusted. In this way Defendant kept Plaintiff in a virtual jail cell. She had no money, no passport or travel documents, no friends, and no outside contact. She feared the harm that would come to her—at the hands of Defendant, or of people in the outside world that he trained her to fear and mistrust—if she tried to escape. Her distress was so severe that she had recurring headaches and could not sleep (a condition that persists to this day). She was under such control that Defendant

could feel free to leave her at home alone.  These conditions persisted for approximately 15 months.

21. Plaintiff's ordeal ended only with the advice and guidance of a Good Samaritan who witnessed her suffering while visiting Defendant's house.  When the Good Samaritan learned the details of Plaintiff's situation, this person helped her escape. Finally, after years of intolerable abuse, on December 9, 2008, Plaintiff gathered her courage in the middle of the night to leave.  She gained access to the locked drawer that held her passport, took this and other personal belongings, and left.

22. During the entire period Plaintiff worked for Defendant, she was forced to work a minimum of 16 hours per day, 7 days per week.  For this work, she was paid the equivalent of just pennies an hour, without breaks or any days off.  She now seeks full compensation for her labors and loss of freedom, along with any other relief as the Court sees as just and proper.

V. **CAUSES OF ACTION**

**FIRST CLAIM FOR RELIEF**
Trafficking Victims Protection Reauthorization Act; Forced Labor
(18 U.S.C. §§ 1589, 1595)

23. Plaintiff incorporates each of the foregoing paragraphs by reference.

24. The TVPRA imposes criminal penalties and civil liability on any person who knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means: (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.  18 U.S.C. § 1589(a).

25. As used in the TVPRA, "[t]he term 'serious harm' means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

26. Defendant knowingly obtained Plaintiff's services in his Richardson home by means of a scheme, plan, or pattern intended to cause her to believe that she would suffer serious harm or physical restraint if she did not perform such services. He confiscated and locked away Plaintiff's passport, denied her access to money, forbade her to leave the house or have contact with anyone besides family in the Philippines, taught her to be afraid of people in this country, and cowed her into submission by use of verbal and physical intimidation.

27. Defendant knowingly obtained Plaintiff's services by means of force, threats of force, physical restraint, or threats of physical restraint.

28. Defendant knowingly obtained Plaintiff's services by means of serious harm or threats of serious harm.

29. As a result of Defendant's conduct, Plaintiff was compelled to continue laboring for him and suffered damages. Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for Defendant's wrongful conduct. Because of the malicious and wantonly abusive nature of Defendant's conduct, Plaintiff is also entitled to an award of punitive damages.

## SECOND CLAIM FOR RELIEF
Trafficking Victims Protection Reauthorization Act; Trafficking Into Servitude
(18 U.S.C. §§ 1590, 1595)

30. Plaintiff incorporates each of the foregoing paragraphs by reference.

31.     The trafficking into servitude provision of the TVPRA, 18 U.S.C. § 1590 provides that it is a violation to knowingly recruit, harbor, transport, provide, or obtain by any means, any person for labor or services in violation of the TVPRA.

32.     Defendant knowingly recruited, harbored, transported, and obtained Plaintiff to provide labor and services in violation of the TVPRA.

33.     Plaintiff suffered damages as a result of Defendant's conduct.

34.     Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees.  Because of the malicious and wantonly abusive nature of Defendant's conduct, Plaintiff is also entitled to an award of punitive damages.

### THIRD CLAIM FOR RELIEF
Fair Labor Standards Act
(29 U.S.C. § 201, *et seq.*)

35.     Plaintiff incorporates each of the foregoing paragraphs by reference.

36.     The FLSA, 29 U.S.C. § 206, provides that a person employed in domestic service in a household shall be paid the minimum wage as required by law.  This includes domestic service employees who live in the household where they are employed.  29 C.F.R. § 552.102.

37.     Defendant was an employer within the meaning of the FLSA but never paid Plaintiff the minimum wage for the services she provided to him.

38.     Defendant knowingly and willfully required, suffered, or permitted Plaintiff, a non-exempt employee, to work hours well beyond a normal work day, including working a minimum of 16 and a half hours a day, seven days a week, and knowingly and willfully failed and refused to pay Plaintiff the minimum wage for hours worked as required under federal law.

39.     Defendant often required Plaintiff to be on-call 24 hours a day without any rest breaks or uninhibited sleep time.  During many nights, Defendant's children kept Plaintiff

awake, denying her a reasonable night's sleep.  Defendant required that Plaintiff work through meals and be on call at all times.  There never were any periods of total freedom from Plaintiff's duties, and she could not leave the house.

40. Defendant knew, should have known, or showed reckless disregard for the FLSA minimum wage and overtime provisions applicable to Plaintiff and willfully, intentionally, and without good faith violated these laws.  As a result of Defendants' willful violations of the FLSA, under 29 U.S.C. § 216(b), Plaintiff is entitled to recover her unpaid wages, an additional equal amount in liquidated damages, and reasonable attorneys' fees and costs in amounts to be proven at trial.

### FOURTH CLAIM FOR RELIEF
Fraud

41. Plaintiff incorporates each of the foregoing paragraphs by reference.

42. In order to induce Plaintiff to come to the United States, Defendant made express and implicit assurances about what her job and life would be like here.  Among other promises, he told Plaintiff that she would have her own bedroom and be allowed to take Sundays off from work, and he intentionally led her to believe through his conduct and other representations that she would be treated with respect.

43. These representations were important to Plaintiff and caused her to come to the United States, and Defendant intended this result.  Plaintiff's reliance on Defendant's representations was reasonable.  Defendant had no intention of fulfilling his promises, however.  He knew that they were false at the time they were made.

44. As a result of Defendant's deception, *inter alia,* Plaintiff lost her freedom and lived and worked under abusive circumstances in the United States—with inadequate pay—for

15 months. She has suffered chronic headaches and insomnia as a result of her distress. She is now living far from home and without the means to see her family in the Philippines.

45. Plaintiff is entitled to recover her damages in an amount to be determined at trial, and in any event may recover nominal damages for Defendant's fraud. Further, Defendant's tortious conduct was aggravated by the willfulness, wantonness, and malice for which the law entitles Plaintiff to a recovery of exemplary damages.

### FIFTH CLAIM FOR RELIEF
False Imprisonment

46. Plaintiff incorporates each of the foregoing paragraphs by reference.

47. Defendant intentionally detained Plaintiff in his home, without her consent, by use of threats and physical force.

48. Defendant had no legal authority for this detention.

49. Plaintiff has suffered damages in an amount to be determined at trial, and in any event may recover nominal damages. Further, Defendant's tortious conduct was aggravated by the willfulness, wantonness, and malice for which the law entitles Plaintiff to a recovery of exemplary damages.

### SIXTH CLAIM FOR RELIEF
Intentional Infliction of Emotional Distress

50. Plaintiff incorporates each of the foregoing paragraphs by reference.

51. Defendant knew or had reason to know that his outrageous conduct, including his abuse of Plaintiff and his taking away of her liberty, would cause her a high degree of emotional distress.

52. Plaintiff in fact suffered severe emotional distress as a result of Defendant's actions, including terrible fright, grief, shame, humiliation, worry, and anxiety. This, in turn, has caused her to experience physical reactions, including frequent headaches and chronic insomnia.

53. Plaintiff is entitled to recover damages in an amount to be determined at trial. Further, Defendant's tortious conduct was aggravated by the willfulness, wantonness, and malice for which the law entitles Plaintiff to a recovery of exemplary damages.

### SEVENTH CLAIM FOR RELIEF
Money Had & Received

54. Plaintiff incorporates each of the foregoing paragraphs by reference.

55. Defendant holds money that Plaintiff earned for services performed in Lebanon, but which he has not yet remitted to her. This money belongs to Plaintiff in equity and good conscience.

56. Plaintiff is entitled to recover actual damages in this amount.

### JURY DEMAND

57. Plaintiff requests a trial by jury.

### VI.  PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that this Court:

1. Rule in favor of every cause of action asserted in the Complaint;

2. Award such damages as may be appropriate, including punitive and liquidated damages;

3. Award Plaintiff her attorneys' fees and costs;

4. Award Plaintiff pre- and post-judgment interest; and

5. Award any such other and further relief as the Court deems just and proper.

    DATED this 13th day of February, 2009.

      Respectfully submitted,

      BAKER BOTTS L.L.P.


       */s/  Victor Vital*
        Victor Vital
        State Bar No. 00794798
        John Lawrence
        State Bar No. 24055825
        john.lawrence@bakerbotts.com
        Jonathan R. Mureen
        State Bar No. 24060313
        jon.mureen@bakerbotts.com
        Roshan Mansinghani
        State Bar No. 24057026
        roshan.mansinghani@bakerbotts.com

      2001 Ross Avenue, Suite 600
      Dallas, Texas 75201-2080
      Telephone:  (214) 953-6500
      Facsimile:  (214) 855-8200

      ATTORNEYS FOR PLAINTIFF